CLERK'S OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED
NOV 1 4 2008
JOHN F. CORCORAN, CLERK
BY: /s/ Pau Coleman
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

| | |
|---|---|
| ARNOLD M. PUGH, <br><br> *Plaintiff,* <br><br> v. <br><br> MICHAEL DEAN ABBOTT, <br><br> *Defendant.* | CIVIL NO. 6:08cv00001 <br><br> MEMORANDUM OPINION <br><br> JUDGE NORMAN K. MOON |

This matter is before the Court on the Defendant's Motion for Summary Judgment [docket no. 19]. The complaint in this case was filed on January 4, 2008. Plaintiff claims violations of his Fourth, Fifth, Eighth and Fourteenth Amendment rights as a result of Deputy Abbott's use of excessive force, assault, false arrest and malicious prosecution. Plaintiff sues for compensatory and punitive damages.

Defendant answered the complaint on March 3, 2008. The parties have conducted discovery, and Defendant moved for summary judgment on October 17, 2008, addressing only the excessive force claim on grounds that Plaintiff has failed to show a violation of his Constitutional rights, or if he has, that Deputy Abbott is entitled to qualified immunity. The other state law claims have not been addressed by either party. A hearing on the motion was held on November 12, 2008. For the reasons that follow, the Court will grant the Defendant's motion.

# I. BACKGROUND

This case arises out of the arrest of the Plaintiff, Arnold Pugh, on March 8, 2007. At the time of the arrest, Mr. Pugh was 69 years old. (Compl. ¶ 2.) On the evening of March 8, 2007, the Plaintiff was driving on Main Street in Bedford, Virginia, and made an illegal left turn onto South Bridge Street. (Pugh Dep. 10, Sept. 16, 2008.) The Plaintiff continued into the parking lot of the Vista Foods on South Bridge Street. (*Id.* at 10.) Defendant Abbott, a deputy with the Bedford County Sheriff's Office, observed the illegal turn, activated his lights and siren, and followed Mr. Pugh into the parking lot. (*Id.*)

Despite the arrival of the Defendant, Mr. Pugh exited his vehicle, a pickup truck, and headed towards the grocery store. (*Id.* at 10-11.) The Defendant ordered Mr. Pugh to return to the vehicle, which he did. (*Id.* at 11.) The Defendant asked Mr. Pugh for his driver's license. (*Id.* at 12.) Mr. Pugh did not immediately produce his driver's license. Instead, he responded, "Why should I? I don't think I done anything wrong." (*Id.* at 15.)

At this point, the parties' accounts of the events diverge. According to Mr. Pugh, after Deputy Abbott requested a second time to see Mr. Pugh's license, Mr. Pugh removed his wallet from his pocket and held it out in front of him. (*Id.* at 16.) Mr. Pugh asserts that he never explicitly refused to produce his driver's license. (*Id.* at 20.) He recounted that "[Deputy Abbott] never give me a chance to get my driver's license out. I had it in my hand, I had my billfold in my hand. I was in the process of getting my driver's license out. All of a sudden [Deputy Abbott] just said, 'You are under arrest' and slammed me against my truck. Then there I was laying on the ground with his knee in my back." (*Id.* at 20:10-17.) He further stated that he never yelled at Deputy Abbott during the course of their conversation. (*Id.* at 24-25.)

According to Deputy Abbott, Mr. Pugh's tone and demeanor were threatening during

their encounter. (Abbott Dep. 10-11, Sept. 16, 2008.) Deputy Abbott recalls that Mr. Pugh said that Deputy Abbott didn't have the authority to stop him. (*Id.* at 11.) He also said that Mr. Pugh "told me numerous times and numerous different ways that he was not going to show me his driver's license." (*Id.* at 13: 8-10.) Eventually, Mr. Abbott told him to get back in his truck and show him the driver's license, or he would arrest Mr. Pugh for obstruction of justice. (*Id.* at 14.) At that point, Deputy Abbott said that Mr. Pugh made a sudden movement with his hand towards the side of Deputy Abbott's head. Deputy Abbott saw this motion out of the corner of his eye, and interpreted it as threatening. (*Id.* at 10.) He explained, "At the time, the threat that I perceived was a physical threat to my person. I reacted with trying to take Mr. Pugh into custody and having control of him." (*Id.* at 9:17-19.)

Mr. Pugh states that Deputy Abbott then grabbed Mr. Pugh by the shoulder, pushed him against his truck, and eventually maneuvered him to the ground. (Pugh Dep. 21-22.) Defendant Abbott held Mr. Pugh face down on the ground with his knee in Mr. Pugh's back, and handcuffed him. (*Id.* at 23-24.) As a result of this use of force, Mr. Pugh suffered a back sprain, a bruised hip, and abrasions and bruises to his face, back, hands, and arms. (Compl. ¶ 21; Pugh Dep. 27-29.) Mr. Pugh did not require medical attention for his injuries. (*See* Pugh Dep. 26-28.) Mr. Pugh's truck was also damaged by the force with which Defendant Abbott pushed Mr. Pugh into it. (Compl. ¶ 21.)

Deputy Abbott states that he grabbed Mr. Pugh's right arm, whereupon Mr. Pugh "jerked back." (Abbott Dep. 14.) Deputy Abbott followed the force of the jerk, and applied extra force to try to take Mr. Pugh to the ground. (*Id.* at 15.) Mr. Pugh slammed against the truck, which was "just in the way," and the impact resulted in damage to the truck. (*Id.* at 15-16.) Deputy Abbott insists that he did not try to slam Mr. Pugh against the truck. (*Id.* at 16.) Deputy Abbott

admitted that after he had handcuffed Mr. Pugh, he saw that Mr. Pugh did in fact have his wallet in his hand. (*Id.* at 16:20.)

A third account of the incident comes from a bystander, Carter Garrett, who witnessed the entire encounter. Mr. Garrett was standing on his office porch, which faces the Vista Foods parking lot, when Mr. Pugh drove into the lot, with Deputy Abbott following. (Garrett Dep. 6, Oct. 14, 2008.) He saw Mr. Pugh get out of his car, wave to Deputy Abbott, and begin to walk towards the grocery store. (*Id.* at 6.) Deputy Abbott called him back, and Mr. Pugh returned to speak to Deputy Abbott. (*Id.* at 8.) At this point, Mr. Garrett was not within earshot the conversation, but could see both men clearly. (*Id.*) Mr. Garrett described that both Mr. Pugh and Deputy Abbott "got fairly animated fairly quickly. . . . I don't want to say tempers were rising at this point, but certainly it had gotten confrontational. You could tell it from the body language." (*Id.* at 8:12-16.) During the conversation, Mr. Garrett observed Mr. Pugh shaking his finger at Deputy Abbott. (*Id.* at 9.) In order to better observe the confrontation, Mr. Garrett moved from his porch closer to the parking lot, until he could hear what was being said. (*Id.* at 16.) He then heard Mr. Pugh saying something to the effect of, "Why do you want to see my I.D.?" (*Id.*) Mr. Garrett described that Mr. Pugh was not yelling, but that "there was heightened emotion" in the voices of both Mr. Pugh and Deputy Abbott. (*Id.* at 19.)

Mr. Garrett then recounts that:

> Mr. Pugh kind of for an instant put his hands on his hips like this (indicating) like he was contemplating what to do. Then he reached for his back pocket, and I presume to get his wallet where his driver's license was. When he made the motion towards his back pocket is when [Deputy Abbott] made a pretty athletic move where he . . . came under Mr. Pugh, grabbed Mr. Pugh under his arms by his armpits, lifted him off his feet into the side of the truck at which time Mr. Pugh said, "Oh, my back." Then [Deputy Abbott] took him face down onto the surface of the parking lot and got his knee into Mr. Pugh's back.

(*Id.* at 17:3-18.) Mr. Garrett never heard Mr. Pugh verbally indicate that he was going to produce his driver's license. (Id. at 19.)

After Mr. Pugh's arrest, Defendant Abbott brought him before a magistrate on an assault charge. (Compl. ¶ 23.) Deputy Abbot's deposition indicates that Mr. Pugh was charged with three crimes, and plea bargained them, but there is no other evidence in the record on the outcome of those charges.

## II. STANDARD OF REVIEW

A court should grant summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "As to materiality . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In order to preclude summary judgment, the dispute about a material fact must be "'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* However, if the evidence of a material fact "is merely colorable or is not significantly probative, summary judgment may be granted." *Id.* at 250.

In considering a motion for summary judgment under Rule 56, the court must view the record as a whole and draw reasonable inferences in the light most favorable to the nonmoving party. *See, e.g., id.* at 248–50 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986); *In re Apex Express Corp.*, 190 F.3d 624, 633 (4th Cir.1999).

## III. DISCUSSION

Claims of excessive force that occur during a search or seizure are analyzed under the Fourth Amendment,[1] which applies a "reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 394-95 (1989). "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396 (internal quotations and citation omitted). "Reasonableness" is judged from the perspective of a reasonable officer under the circumstances; it is an objective standard that does not take into account the intent or motivation of the actual officer at the time. *Id.* at 396-97. "'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' violates the Fourth Amendment." *Id.* at 396 (*quoting Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)).

A court must make "allowance for the fact that police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving." *Graham*, 490 U.S. at 397. "The court's focus should be on the circumstances at the moment force was used and on the fact that officers on the beat are not often afforded the luxury of armchair reflection." *Elliott v. Leavitt*, 99 F.3d 640, 642 (4th Cir. 1996) (citations omitted). Finally, the officer's perceptions of the circumstances should guide the court's determination of the reasonableness of his or her response, rather than a determination of what the circumstances actually were. *Gooden v. Howard County, Maryland*, 954 F.2d 960, 965 (4th Cir. 1992)(en banc) ("In cases where officers are hurriedly called to the scene of a disturbance, the reasonableness of their response must be gauged against the reasonableness of their perceptions,

---

[1] When excessive force is alleged in the context of an arrest or investigative stop, as it is here, the protections of the Fourth Amendment most appropriately apply. *Graham v. Connor*, 490 U.S. 386, 394-95 (1989). Therefore, Plaintiff's Fifth, Eighth and Fourteenth Amendment claims are not applicable.

not against what may later be found to have actually taken place.").

Under this standard, police officers are not required to perfectly interpret the situation, or to react perfectly to it. The Fourth Circuit has held that officers were entitled to qualified immunity after shooting an unarmed suspect, because the officers reasonably believed that the suspect might have been reaching for a weapon. *Anderson v. Russell*, 247 F.3d 125 (4th Cir. 2001). The court noted that "'the Fourth Amendment does not require omniscience…Officers need not be absolutely sure…of the nature of the threat or the suspect's intent to cause them harm—the Constitution does not require that certitude precede the act of self protection.'" *Id.* at 132 (*quoting Elliott v. Leavitt*, 99 F.3d 640, 643 (4th Cir. 1996)). The Fourth Circuit also noted that officers are "not required to see an object in the suspect's hand before using deadly force." *Id.* at 131; *see also Slattery v. Rizzo*, 939 F.2d 213 (4th Cir. 1991) (granting qualified immunity where officer used deadly force even though he could not see a weapon in the suspect's hand, and where it was not entirely clear that the suspect's movement indicated an attack).

If the Court finds that the Defendant violated Mr. Pugh's Fourth Amendment rights, it must then determine whether Deputy Abbott is entitled to qualified immunity. Law enforcement officers are entitled to qualified immunity if the officer was performing a discretionary function and his or her actions did not violate clearly established law. *See Anderson v. Creighton*, 483 U.S. 635, 638 (1987) (government officials performing discretionary functions are entitled to qualified immunity "as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated"); *Malley v. Briggs*, 475 U.S. 335, 341 (1986) (qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law"); *Mitchell v. Forsyth*, 472 U.S. 511, 528 (1985) (officials are immune unless "the law clearly proscribed the actions" they took); *Sevigny v. Dicksey*, 846 F.2d 953, 956 (4th Cir. 1988)

("At its most general level, the test of qualified immunity for executive officers is one of 'objective legal reasonableness'-whether an official acting under the circumstances at issue reasonably could have believed that his action did not violate the constitutional rights asserted"). Further, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson*, 483 U.S. at 640.

Applying these standards to this case, I conclude that Mr. Pugh has failed to show that Deputy Abbott violated his Fourth Amendment rights, and that no genuine issue of material fact exists based on the evidence submitted to the Court.[2] Viewing the evidence in the light most favorable to Mr. Pugh, there is still simply no basis to hold that Deputy Abbott's actions were unreasonable given the circumstances.

According to Deputy Abbott's deposition testimony, he perceived Mr. Pugh's movement with his arm in reaching for his wallet as threatening. This perception was not unreasonable under the circumstances. Mr. Pugh had already given Deputy Abbott some verbal indication that he was unwilling to produce his driver's license. While he may not have said as much explicitly, his repeated questioning of Deputy Abbott's justification for stopping him shows that he was unwilling to comply with Deputy Abbott's request to see his license.

As the conversation continued, Mr. Pugh never made any statements to indicate that he had changed his mind and would cooperate with Deputy Abbott. Deputy Abbott had no way of knowing what Mr. Pugh was reaching for when he made a movement with his arm towards his pocket, and he was not required to wait to find out whether it was actually a weapon before acting to protect himself. Because Mr. Pugh and Deputy Abbott were in close proximity to one

---

[2] It should be noted that Mr. Pugh does not deny that he made an illegal left turn, and it is not disputed that Deputy Abbott was justified in stopping Mr. Pugh for the illegal left turn. It is also undisputed that Deputy Abbot was justified in asking for Mr. Pugh's license. Such a request is standard procedure during the course of a traffic stop. *See United States v. Foreman*, 369 F.3d 776, 781 (4th Cir. 2004).

another, it is reasonable to expect Deputy Abbott to react quickly if he sensed a threat to his person. Given the circumstances, in which Mr. Pugh was admittedly less than fully compliant with Deputy Abbott's orders, it was not unreasonable for Deputy Abbott to be wary of a physical threat from Mr. Pugh, and to interpret as a threat what later turned out to be an innocent movement.

Similarly, the amount of force used by Deputy Abbott was not unreasonable. Mr. Pugh does not allege that Deputy Abbott used deadly force, or anything approaching deadly force. There is no suggestion that Deputy Abbott used a weapon of any kind during the course of the arrest. Deputy Abbott only grabbed the Plaintiff with his hands, pushed him against the truck, and forced him to lie face down on the ground, where Deputy Abbott restrained him with his knee until he was handcuffed. Mr. Pugh sustained only minor and temporary injuries: a strained back, a bruised hip, and some minor scrapes. This is further evidence that the amount of force used by Deputy Abbott was not unreasonable. Therefore, Deputy Abbott's motion for summary judgment will be granted.

## IV. STATE LAW CLAIMS

The remainder of the Plaintiff's claims arise under state law. Neither party has addressed those claims in the instant motion or otherwise during these proceedings. Thus, the Court is left to determine whether, in light of its grant of summary judgment on Plaintiff's single federal claim, it should exercise supplemental jurisdiction over the remaining state law claims. In deciding whether to exercise supplemental jurisdiction, "a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity." *Carnegie-Mellon University v. Cohill*, 484 U.S. 343, 350 (1988). Having considered those factors, I decline to exercise supplemental jurisdiction over

Plaintiff's state law claims, and those claims will be dismissed without prejudice. 28 U.S.C. § 1367(c)(3).

## V. CONCLUSION

For the reasons stated herein, the Court will grant the instant Motion (docket no. 19). An appropriate Order will follow.

The Clerk of the Court is hereby directed to send a certified copy of this Memorandum Opinion and the accompanying Order to all counsel of record

ENTERED: This 14th Day of November, 2008

NORMAN K. MOON
UNITED STATES DISTRICT JUDGE